At all. 15 minutes for the plaintiff and 15 minutes to be shared by defendants. Mr. Smeltzer for the appellant. Good morning. Good morning, your honors. May it please the court, John Smeltzer for the United States. I'm joined by Anne Nabarro, counsel for the Corps of Engineers. I'd like to reserve three minutes time for rebuttal. Your honors, the State of Ohio owns the coal from the Burr Oak Reservoir, which is part of a federal flood control project, only because Ohio agreed in 1948 to acquire the coal for the specific purpose of extinguishing private mining rights and prohibiting mining in the reservoir area. That agreement gave the United States a measure of project security, namely the ability to operate the project without interference or potential interference from mining. More than 60 years later, Ohio unilaterally determined that it was free to lease project coal without the consent of the Corps and in disregard of the Corps' bargain for contract interest. I just want to ask a quick question. Is this case about Ohio's general ability to sell mining rights in the project area or is it about the corridor that was mined connecting the two pieces of property? It concerns both because it's the mining in the corridor that of course raised the contractual question, but the resolution of the contractual question depends on the project coal as a whole because the documents and the agreements address the project coal as a whole. And we submit that the 1948 agreement imposes an obligation on Ohio not only to acquire but to retain the coal that was acquired for the project. And that's a 1962 quick claim deed under which the specific project coal was acquired by Ohio in this case does not extinguish the covenants that the parties agreed to in the 1948 agreement. Do you agree that nothing says that they can't mine the coal? No. No, we wouldn't agree, Your Honor. And let me talk to the specific language in the 1948 agreement and the related documents that address that. The principal article of the 1948 agreement at issue here says that Ohio shall acquire all lands and or interest in lands necessary for the project in accordance with an approved project plan, which is also known as the definite project report, and a land acquisition program to be agreed upon by the parties, which became to be known as the real estate planning report. Both of those documents unequivocally state, quote, it will be necessary to acquire all coal rights in the lands below elevation 740, which is the spillway crest level, plus an additional section of coal to provide a protective barrier between the reservoir pool at the crest level and the adjacent mining measures. For separate reasons, the parties agreed that the flood easement to be conveyed to the United States should cover land up to elevation 750. So in the real estate planning report, the parties noted that if the coal was acquired in that same area, up to elevation 750, it would provide that adequate protective barrier between the spillway crest or between the reservoir and the adjacent measures. And therefore, the parties said that they considered it desirable that mining operations be prohibited within or upon the entire easement area, and they concluded by proposing that the state acquire as a minimum requirement the coal in the lands lying below elevation 750. The district court focused on the terms proposal and desire and said, well, look, those don't represent a binding commitment, but that disregards the role that the real estate planning report played in relation to the 1948 agreement. The 1948 agreement specified that the district engineer and the state of Ohio were to agree on a land acquisition program and then submit it for approval to the chief engineer. The real estate planning report was signed by the district engineer and by the Ohio state representative to serve as the agreed upon land acquisition program. In other words, the stated proposal was an agreed upon proposal between the state of Ohio and the district engineer. Once that proposal is approved by the chief engineer, the joint proposal becomes the agreed upon program, which is binding under the terms of the 1948 agreement. And as just noted, the program specifically called for the state to acquire as a minimum requirement the coal under lands up to 750 feet for the specific purpose of prohibiting mining. And of course, we know that the parties actually... Excuse me. It's your last sentence, the specific purpose of prohibiting mining. I think, where do you get that from, the specific purpose of prohibiting mining? Real estate planning report says, quote, it is considered desirable that mining operations be prohibited within or upon the entire easement area. That's the statement of the party's purpose behind the proposal. If you read the whole... I think this is a very hard case. If you read all of the documents, at least I was left with the feeling that, look, they're building this project. They believe that they have to protect against a few things. They're going to be flooding property, so they have to get the title to all the property that they're flooding. And any property that's flooded will preclude any mining or use of the minerals under that property. And therefore, they have to secure all of those rights, so they can't be liable to anybody for interfering with their right to mine what's under the surface. And so, because, and it says there, because you can't mine, we're going to have to get all of the subsurface rights. So you have this situation where everybody sort of assumes that you're not going to be able to mine under flooded waters. And there's also something that's going to be built where you will be able to mine under that. And so they say, well, we don't have to get the subsurface rights for that area. But I don't know that there was any thought about whether, if mining were possible in areas, say, for instance, we don't flood everything up to 750, can you mine before it's flooded? I mean, it doesn't seem like that was what this agreement is about. Well, Your Honor, what we submit is the language that says that operation of the reservoir will prevent mining. It doesn't, that doesn't mean that the parties assumed that it was impossible to mine under the reservoir, right? I mean, back in 1948, there was the ability to horizontally mine, you know, you drill down and then you go over. I mean, that's not unusual in mining. And so what the term prevent says is that, you know, ultimately that kind of mining is going to be incompatible with the operation of the reservoir, either because people who own those rights are going to say, well, we can't do it because it's unsafe and therefore we have a takings claim, or, you know, because if they do it and they build a cavity beneath the reservoir, it's going to affect the reservoir operation. But either way, right, it's the same thing in the sense of it's motivating the parties to acquire the coal to prohibit that from happening and to prohibit there from being any concern about the interference with private mining and with the reservoir operations. Now, once they reach that agreement, then the project coal, you know, it's part of the project. It is something that the United States acquired through this agreement that gives the security that the United States needs now that there won't be further leasing that would subject... But aren't they always, I mean, they're always subject to the requirement that it not interfere with the project in any way. I think that's implicit in the documents. Well, the question is how is it determined what interference is and then can the parties agree as a protective measure, you know, prior to the project that we're going to do something specific to provide that assurance, right? You know, if there wasn't any contractual agreement to acquire the coal and it was left in private hands and private folks, you know, wanted to mine, there could still be a claim where the Corps said, no, you can't mine here because that's going to interfere with our easement. But that would leave the Corps to have to do it on a case-by-case basis whenever anybody wanted to come in and mine. What the parties did here is up front said, look, as a protective measure, as a precautionary preventative measure, we're going to acquire all of the coal in the project area and the state of Ohio, you're going to hold that coal. This area is not yet flooded, right? The area where the particular corridor was built is at about elevation 725. The ordinary pool, reservoir pool level is about 721 feet. The crest level, as we said, is at 740 feet. So if heavy rains and flooding and the reservoir is maintained up to 740, the corridor is under the reservoir. Has it ever gotten up there in that area? I believe historically it has gotten, maybe not all the way to 740, but it has gotten to where the corridor is. But again, as Your Honor asked initially, the first question was, is this about that particular corridor or is the contract question about the coal as a whole? If the state is right, they could lease coal under the heart of the reservoir anywhere, right? Because there's no difference in the contractual language, the precautionary language that says we're going to acquire the coal in the reservoir area to prohibit mining that says, well, you can only do it when it's up at a certain level. If Ohio comes in and says, we think it's safe, they could make the same argument. And then the Corps would be stuck in a situation where we disagree as to whether it's safe. We disagree now as to whether this particular mining corridor was safe and whether there was sufficient information to ensure the long-term integrity of the reservoir area where the corridor was mined. But you've given up that argument, right? Given up? No, Your Honor. We sought a TRO to prohibit the mining and in that context had to prove irreparable harm. And the district court found that there wasn't that irreparable harm. We haven't given up on the notion that there might be a remedy here. We're asking the court to find that the contract agreements essentially prohibit mining in this area and to send it back for further proceedings. And in that context, then we can flesh out, did the mining that actually occurred pose a risk and then what is the remedy for that risk? Should there be additional monitoring, additional investigation, those sorts of things? So we haven't given up on the idea that we don't agree that there's no risk. And this was, there was, was there any testimony, I guess, are the individuals who worked on this deal still alive? I don't know, Your Honor. There was some extrinsic evidence that, you know, we pointed to in the briefs and it's in the record memoranda, for example, that describe particular, you know, the motivations of the parties that are all in accord with the argument that I presented. But essentially we submit that the language is plain. You know, you acquire the coal for a specific purpose that is only served by retaining it, you know, during project operation and that the court doesn't need to look to extrinsic evidence to. And what do you do if, let's say that this wasn't covered? Assume that. Assume it wasn't covered because they really didn't think that they'd be able to mine under the area that was flooded. What's the consequence? I mean, if, Your Honor, what's the consequence if the agreement doesn't say what we say it means? Then, you know, we're left with a tort remedy and having to prove that the actual mining interfered with the easement. But what we submit is that, you know, we signed up for a contract agreement, a condition that they acquired this coal. There was no reason, if Ohio thought it was safe to mine up at 750 or 725 feet or wherever, there was no reason to acquire the coal in the first place. What about this 1962 quick claim deed? Why didn't that change anything? Well, because the quick claim deed specifically says it's in furtherance of and in compliance with the 1948 agreement. And there wouldn't be a quick claim deed, there wouldn't be a reason to give the coal back or to give the coal in the first instance to Ohio in this circumstance. The coal that the United States acquired for Ohio, pursuant to the provisions of the 1948 agreement, if the parties didn't intend for that agreement to continue, and, of course, that agreement contains continuing obligations that are broader in scope than just the specific purpose of the quick claim deed. And for a host of reasons, that deed can't be interpreted as giving rise to intent to extinguish the 1948 agreement. This is just a curiosity question. Minimum requirement to acquire all the coal in the lands lying under. It would seem, why was that particular verbiage used as opposed to mineral rights? Because the oil and gas rights were separately considered, Your Honor. The coal are at our specific elevation. It's approximately 60 feet below the surface at the area. And there was a determination that because of that, the coal should be acquired and coal mining is incompatible. There was a separate determination and some oil and gas was allowed. But in the contract documents, they were separately considered. So they didn't say minerals because they're separate considerations with respect to do you need to acquire the oil and gas versus do you need to acquire the coal? Because, of course, coal mining presents its own unique set of risks versus... So if I was a landowner and they were acquiring my land, I theoretically would have still retained some mineral rights? It would have depended on, I think in some of the lands, the acquisition documents allowed reservation. But I think some of the oil and gas was separately held to begin with. So most of the, at least the coal, most of the coal was all separately held. And, of course, the parties specifically reached out to get that coal because they considered it necessary. It wasn't part of the acquisition of the land because it wasn't held in common with the land. My time is well up, so unless there are further questions, I'd like to reserve a little rebuttal. All right. You have your rebuttal. Thank you. May it please the Court. John Kulowitz for Buckingham Coal Company. On behalf of Buckingham Coal Company, I propose to focus the first half of our oral argument on the significance of the 1962 deed. The State of Ohio will focus the second half of the argument on the alleged covenants that are conspicuous by their absence from that deed. The only instrument that matters as to the coal is the 1962 deed. The deed is dispositive both as a matter of law and as a matter of fact. Everything comes down to the deed. It is dispositive as a matter of law because of the Doctrine of Merger by Deed. And in direct response to Judge White's line of questions here, the Doctrine of Merger by Deed is especially applicable here because every one of the sentence fragments that the United States asks the Court to deem as a covenant is written in the future tense or the conditional tense. It is the things that when all is said and done, it is a contemplation of the parties the State of Ohio would do or will do. Fourteen years passed between 1948 and 1962. A lot of things changed, one of which being the ad hoc agreement by which the federal government gave this land back to the State of Ohio. The United States is basing the bulk of its argument on Article I, Section 4 of the contract of the 1948 agreement and saying that that's what's determinative here. But if you look at the preamble of that, the first part of Article I, Section 4 says it does not apply to lands that the federal government is acquiring here, which is what happened with these particular tracts. The federal government had to come in and acquire these particular tracts of land. There is nothing else in the agreement that says what will happen after that. It was an ad hoc agreement by which the federal government thereafter gave this land to the State of Ohio. And when the time came in 1962 for performance of these arguably executory contracts, because at most that's all that they were, we don't think they were even executory contracts, but all these future tense and conditional tense undertakings in the 1947 and 1948 agreements, if they were executory contracts, when the time came for their performance in 1962, what the parties delivered, what the U.S. delivered as the statement of the ultimate intent of the parties was a fee simple title to the State of Ohio. That is fundamentally contradictory to any supposed agreement as to restriction of the land and it cannot coexist. There is no survival clause in any of the documents in which the United States is relying and there is no contemporary document delivered with the deed saying that it was the intent of the parties that any of these arguable terms and conditions would survive the delivery of the deed. Instead what the United States gave was a fee simple title to the State of Ohio. As a matter of law, any cause of action based upon any previous term and condition ceases to exist. The deed supersedes all previous terms and conditions that were necessary to the conveyance. So as a matter of law, the 1962 deed is dispositive. But the deed does more than that. It tells you as well, it's dispositive as well as a matter of fact, because it gives you the clearest possible example of what the parties intended. The deed says, the deed was delivered, but it recites in the beginning that it is delivered, quote, in compliance with and furtherance of the 1948 agreement. And what the United States did in effectuation of that agreement was deliver a fee simple deed. But it was a collateral agreement. It wasn't an agreement to transfer the property. Right. Yes, Your Honor. And the way that the United States implemented that whatever the collateral agreement was, the way the United States implemented that with respect to the coal was to give a fee simple title, no strings attached to the coal, to the State of Ohio reserving the flow ageasement. But back to the entire agreement. But, Your Honor, under the Doctrine of Merger by Deed, the deed supersedes any and all previous conditions that were necessary to the conveyance. Even if it's a collateral agreement, only if it's... That's right. Yes, Your Honor. But terms and conditions that are necessary to the conveyance, and nothing could be more central to the conveyance than the habendum clause, the corpus of the conveyance, those are all superseded by the deed. Collateral parts of that, you know, the structure of the dam, where the spillway is going to be located, items like that, Your Honor, I agree, that's collateral to the real estate transfer here. But things that are essential to the transfer that are necessary to the conveyance under the Doctrine of Merger by Deed, those are all superseded by the deed. They are all merged into the deed, and any cause of action based upon them ceases to exist. And the deed tells you something more, too. What the United States also gave in Fee Simple to the State of Ohio in the deed was all means of ingress and egress to the coal. If it had been the contemplation of the parties, and if that's what the deed was meant to... What is the mechanism by which this merger occurred that you keep referring to? You've got the 1948 agreement. Would you agree that that incorporates the project report and the real estate planning report and that all of that governs Ohio's acquisition and the disposition of the coal deposits? Isn't that what we're dealing with, one integrated agreement ultimately here? And it just comes down to the point that Ohio didn't get permission, prior approval, from the Army Corps of Engineers, and therefore you simply don't prevail, is what it amounts to. Well, Your Honor, I respectfully disagree with that perspective on the case, because the 1948 agreement, it references a definite project report, certainly, but if you look at the last in the series of those three documents, the real estate planning report from October 1948, which was the last word with respect to the coal, all that it said in there was, it is considered desirable that mining be prohibited. That means by definition that up to that point in time in the previous two documents there was no agreement, there was no explicit survivable agreement that mining would be prohibited. It meant that even as of October 1948, that was still an open question, and there was nothing in the record, the United States has not claimed that any agreement was made after that to prohibit mining. The next document, Your Honor, and if you want to look at these all together, the next document in the line of succession was the deed, and what the deed did was it gave the coal, it affirmatively conveyed all right, title, and interest in the coal of the United States to the state of Ohio, with no strings attached other than the flow agreement. So we can tell, Your Honor, to the extent that any of those documents matter, what they tell you is that the parties always stopped short of making any explicit survivable commitment as to a restraint on alienation of the land or as to mining of the coal. And we know that because in the 1962 deed, when that was delivered and accepted, what they did there in compliance with and furtherance of the 1948 agreement, they gave it in fee simple to the state of Ohio. If they had intended to have a prohibition of leasing or a prohibition of mining, it would have been completely contradictory, and it would have allowed the frustration of that intent to give a deed in fee simple. The two cannot coexist. I'm not sure it's relevant to the disposition of this matter, but was it contemplated initially that at some point the federal government would deed back rights and so forth to the state of Ohio? Why was this deed ever given in the first instance? The record doesn't show, but just originally, in the context of the flood control legislation, during the New Deal, in the 1936 Flood Control Act, the federal government controlled everything, all surface minerals and everything. In 1938, there began to be a little pushback. In 1944, President Roosevelt and the 78th Congress adopted the 1944 Flood Control Act, and that marked a monumental change there because it gave states, for the first time, rights that they had never had before with respect to mineral development. And we see that legislative history in operation here with the 1962 deed. We see it leading up to it because everybody refrained from making an express commitment about restraining the alienation of that. But then in 1962, what they did in effectuation of the 1944 Flood Control Act was to give the state of Ohio full and complete control of the coal, subject only to the flow agency, which was the one non-negotiable thing that the federal government needed in order to operate. The red light's been on for a good while now. May I just say, in conclusion, Your Honor, the 1962 deed stands in the way, ultimately, of every argument that the United States wants to make here, the alternative conditions leading up to it were merged into it, and when the United States implemented it, it gave. Thank you. Thank you, Your Honor. Okay. Good morning. May it please the Court, Daniel Martin on behalf of the state of Ohio. First, the state completely agrees with what our co-appellees have just discussed with the Court regarding the real estate transactions in the 1960s. Those are what control. There's no need to look and consider at the 1940s agreement. But if the Court feels that it must do so, the result is still the same, that those agreements from the 1940s do not contradict or change the result that Ohio was conveyed in fee simple the coal interest from... Wouldn't you concede that the whole gist of this includes the concept that there will be no coal mining under the reservoir area? Well, that would be one of the points I was going to suggest that the Court should consider is that the language that has been used and referred to by the United States is, as the trial court noted, is contemplative. It talks about in terms of it being desired that there not be coal mining or that it be considered there... The impetus was that there's a desire to control the interest rather than prohibit mining. The actual control... But the assumption is there won't be any coal mining. That was the discussion in the documents in terms of the desire by the parties. But it's more than the thing that says it's desirable that there be no mining in the entire project. There's other language that presumes that there isn't going to be any coal mining under the reservoir area. Isn't there a presumption that it's not... I mean, it actually says since you're not going to be able to mine in the flooded area, you have to get the rights, right? There's an understanding that if the area is flooded and could potentially be flooded, that that would interfere with coal operations. So that is a rationale for why it was desirable to acquire it to avoid claims of takings or damages from someone, all these disparate interest owners at that time who might say my operating rights have been damaged by the flow ageism. The other prime consideration here is to protect the interest that the core is wanting to preserve and that's its flow ageism and maintaining its surface rights. So clearly, surface mining would be directly contradictory to what the core is trying to achieve by protecting its surface interest. And that would be another one of the points I would suggest that... Ohio leasing out project areas to be mined. I don't believe the agreement prohibited or envisioned that that would never happen because there's no express terms in those agreements to say that thou shalt not mine coal or thou shalt not lease coal out because the goal would be for the state to retain the interest so that the project could be fulfilled and the project purposes are flood control, recreation, and water storage. So there's discussion about the TRO and the evidence at that phase of the trial case but there was never any showing that any of these activities would impact those missions, those goals of the project. I agree with you that it doesn't directly... There's nothing here that says it's prohibited. But... I'm not sure I understood your answer. Do you agree that it wasn't contemplated? I would agree that it was the party's desire to avoid operation of coal mining in the area to the extent that it would impact any of the project purposes. Is there any claim that mining, the type of mining that's going on is dangerous to the project? No, Your Honor, and that was thoroughly vetted by expert testimony at the TRO phase at the trial court. This mining operation, first of all, has been permitted. It has also been approved by MSHA, the Federal Mine Safety and Health Administration, and is designed to have zero subsidence. It is an underground mine using a room and pillar method, so the whole, and even the Ohio General Assembly's legislation that authorized the lease stated that, you know, this must only be done in a way that does not impact surface. Is this litigation, it would be only your view, of course, but is it about risk? Is it about money? Who gets money from the coal? What is, what is, what are you defending against? It's a fair question, Your Honor. I believe it's the Corps' position that they have the need to find or develop terms in these 1940s-era agreements that weren't explicitly in the agreement, but they're trying to get that authority through this litigation. I would point out it's important to note, and this is cited in the briefs and internal Corps memoranda, there's discussion within the Corps that says, look, if we don't have, I'm paraphrasing, if we don't have reservations or strict language in the deeds, this could be a problem. And also, if you look at the Corps' action, there are a number of projects, even in the Huntington District, Dewey Lake, Fishtrap Lake, Paintsville Lake, RD Bailey Lake, East Lynn Lake, where mineral extraction, coal mining is occurring in the project. So the argument that there's an inherent necessity to hold this coal doesn't stand scrutiny when you look at how the Corps has allowed it to happen with other projects, even in the Dewey Lake area. Do you have any other sources dealing with this? I believe this particular situation is unique as far as the agreement. I think there's a, perhaps it's a Dewey Lake, or there's an area known as the Pontiki Corridors where it's very similar to this case in that there's a corridor area built underneath to transport coal from one side of the area to another. I don't believe there was litigation. I think that was... I'm looking at Article 4 where it says utilization of the reservoir lands. And I'm just, this hasn't been discussed, but it says no building structure or construction, including wharves, piers, boat slips, or other facilities of any type shall be placed below elevation 7,000 feet and no cuts along the shoreline except by prior written permission of the district engineer. No one has discussed this. Is it because it's not regarded as construction? I don't know what the Corps' reasoning would be for not arguing that issue, but my understanding is that it seems to be referring to structures in the lake or in the water. It makes references to wharves, a more specific type of structure. Is this reservoir lands where this place is? It's in the flowage easement of the 750 elevation, but it's quite a distance removed from the actual dam and the reservoir pool. It's maybe like a mile and a half or something like that, but in the record there's a map that shows where the corridor is. It's under a small tributary, and then further down below is the dam. Is there water over this land? Generally not, other than the small stream. It's east branch of Sunday Creek. Actually, I was looking at the 1948 real estate planning report. The question was raised earlier about does it ever flood up to that level, and the Corps' report, the 1948 report said that it would be extremely remote that it would get to the elevation where this area is located. It would have to be like some biblical storm. It's your position that the permitting you got contemplated if there was extra surface weight from water at a pint of pounds the world around that it would not present a problem? Yes, your honor. As part of the mining permit process, something is analyzed. It's called CHIA. It's a hydrological assessment, and that was conducted, and all these engineering aspects were studied prior to the project. All right. I see you're out of time, and we'll see if there's still rebuttal. Apart from your position that they simply can't do this, is there a perceived harm in their doing it? Yes, your honor. There's a perceived long-term risk to the project, and that's where the disagreement lies. There was expert testimony at the TRO phase from core engineers that said the subsidence will happen in this corridor at some point in the long term, and the core believes that it needs to gather additional information to determine what is necessary to shore it up and to ensure the long-term integrity of the project. Let me quickly... That's not on appeal, right? What's on appeal is the contractual question. Can you do it anywhere in the reservoir area? Which is obviously a much broader question, and that's the broader right that the state is claiming. Let me first quickly address the other projects that were talked about where mining is allowed. Not one of those projects is a project where the parties agreed at the outset, we need to acquire the coal to prohibit mining. Those are all cases where the core... The one case that was addressed, the Pontiki case, I believe, is a case where the core owns the coal and the core agreed to allow mining where the entry, I believe, is 400 feet below the surface. Different circumstance, different situation. What we have here is the core and the state agreeing in advance to prohibit mining. And then the state saying that now it has the unilateral right to determine what is necessary. And that's the problem with this case. Let me address your question, Judge Guy, when you asked why do we have a 1962 deed. And you're right that the deed was not contemplated in the 1948 agreement. What the 1948 agreement allowed was the United States to take over the acquisition duty. And here the state asked the United States to come in and do it because they were having trouble completing it. But what's clear from the record is that the United States executed that deed in order to further the purposes of the 1948 agreement. It's stated plain in the 1962 deed. That's why they did it. Because they understood that's what the parties intended initially. They wanted to put the parties back in the position they would have been in had the Ohio acquired the coal under the 1948 deed. And under that circumstance Ohio would have everything it got in the 1968 deed. Fee title to the lands inclusive of the mineral interest. That's a separate issue from the contractual duty to acquire and hold the coal. There's two things. They acquired it themselves. They still couldn't mine it. No. No. That's the point. The original intent of the 1948 agreement is to leave the United States with the flood easement and Ohio with title to the lands. Ohio wanted a park. The record is clear that the United States agreed to that arrangement. We get the easement. They get the fee because it will facilitate the development of the state park for conservation and recreation purposes allied with federal flood control purposes. This is sort of like recreational uses allowed, water recreational uses and there's certain restrictions and things of that nature. That are allied with federal purposes. And that's the point. Pursuant to the statute and the authorizing legislation they acquired this coal. There was no reason to acquire it for the project but to do exactly what the parties said they were going to do. To prohibit mining in the reservoir area. Or to protect against claims. But either way your honor the question as to whether do we still today need to protect against claims is a decision that was made in 1948 and they said yes. Yes we need to acquire the coal to do that. And now Ohio says well now we can decide when we want there to be a claim against the United States or not a claim. Because we'll just allow the lease. It's the flip side of the same thing. If you're acquiring the coal. If they own the rights they can't complain about the flooding. It's not their interest it's the United States interest in maintaining the integrity of the reservoir. And ensuring that we can operate the reservoir without there being holes underneath it. Right? That impact the structural integrity of the reservoir. And that is the concern of the core. That they will have to change the way they run and operate this reservoir if coal mining is allowed that impacts the structural integrity of the reservoir. I mean it's the United States interest to maintain this flood control project for the purposes of the project. The federal purpose. To stop flooding downstream. To provide water supply. If the United States can't ensure the integrity of the reservoir the United States can't follow through on those obligations that the United States committed to jointly with Ohio. And again Ohio they wouldn't have any coal at all. But for the reason that they're asking for is something for nothing. They're now asking let's lease it. Even though the only reason we got it is because we agreed that we were going to prohibit mining. It's not contrary to their property interest to hold them to their obligation. It is contrary to the United States contractual interest to allow them to unilaterally undo this very specific and concrete agreement. My time's well up Your Honor. Unless there are further questions we ask. Why doesn't that paragraph apply? Paragraph four. We think it's consistent or article four. It's consistent with our arguments. What we are saying that the duty to acquire implicit duty to retain is specific to coal. They had a specific plan that said acquire the coal. Retain it. Don't allow mining. This paragraph talks about structures. It's consistent with the notion that the Corps wants to maintain regulatory control over the easement area. It's also consistent with the notion that the 1948 agreement survives the 1962 deed because it contains these kinds of obligations that are broader than just this one exchange of land. But we did not argue that that was specifically because it addresses structures to be built on the surface at the reservoir. All right. Thank you very much. The case is submitted. There being no further cases, you may adjourn court.